Tilghman C. J.
The defendant contended in the first place, that the plaintiff had shewn no right to the goods of Fitzsimmons; and, in the second place, that he (the defendant) was authorised to sell them, and pay the proceeds to Fscaraltc, by virtue of the ft-fa. issued in his name. It will be necessary, therefore, to state the title both of the plaintiff and defendant. The plaintiff, who is executor of the last will and testament of Benjamin Fuller, deceased, gave in evidence a judgment in this Court for the said Fuller against Thomas Fitzsimmons, entered the 2d September 1799. This judgment was revived by the sci.fa. in the name of William Lexvis, executor of Benjamin Fuller, against Thomas Fitzsimmons. Judgment of the sci. fa. was entered 20th May 1800; a fi.fa. issued to December Term 1800, which was not returned by the sheriff, but an entry of vice comes non misit breve entered on the docket. The execution was continued by entries of vice comes non misit breve until September *155 Í811, when a third pluries Ji.fa. issued, by virtue of-which the sheriff made a levy on the household furniture of Fitzsimmons (who died in the month of August next preceding) In the hands of the defendant, but desisted from proceeding further in the execution in consequence of the prohibition of the defendant. It is to be understood that the continuances by vice comes non misit breve were not in fact entered on the docket until after the issuing of the execution in September 1811. Several exceptions have been taken by the defendant to the proceedings of Benjamin Fuller, and his executor William Lewis, against Fitzsimmons, in this Court,
1st. It is said that Fuller’s judgment was only interlocutory, and therefore no execution could issue on it. The judgment was entered in the way very usual in this Court in actions on the case: that is to say, the ppothonotary entered in the - docket judgment, without mentioning for what sum. Inconvenience^ frequently arise from our loose practice; but the practice of every Court is justly said to be the law of the. Court, and we should produce' much greatef evils than those we wished to prevent, should we attempt now to destroy past judgments, because they were not entered in a manner so accurate as they might have been. I am glad this motion for a new trial has been made, because it affords an opportunity of settling several points of practice by the authority of the whole Court. I take it, that where judgments are confessed (as appears to be the case in Fuller v. Fitzsimmons) if the plaintiff’s demand is in nature of a debt, which may be ascertained by calculation, whether it arise on a note or other writing, or on an account, it is sufficient to enter judgment generally. The judgment is supposed to be for the amount of damages laid in the declaration, and the execution issues accordingly. But the plaintiff indorses on the execution the amount of the actual debt, and if the defendant complains that .injustice has been done, the Court are alwáys ready to' give, immediate and liberal relief on motion. Relief may likewise be given by a Judge at his chambers before the return 'of the execution, a proper case being laid before him verified by oath. That this was intended by the parties as a final and not an interlocutory judgment I am well satisfied,. First, because six weeks stay of execution is given, which is never done on an interlocutory judgment. A stay of execution supposes that execution might issue immediately if a stay were *156 not given, but execution cannot issue on an interlocutory judgment. Again, the confession of judgment by Fitzsimmons on the sci. fa. brought by Fuller’s executors, proves tjlat gotfj parties considered the judgment as final; for, the sci. fa. recited a judgment for sixty thousand dollars, the amount of the damages laid in the declaration; I am therefore of opinion that this exception to the original judgment is not well founded.
2d. Exception is taken also to the judgment on the sci.fa. This judgment was founded on a written agreement, filed of record, between William Lezvis, executor of Benjamin Fuller, and Thomas Fitzsimmons. By this writing, which bears no date, it was agreed that judgment should be entered on the sci. fa. as of December Term 1799; but the agreement was not filed till 20th May 1800, and then judgment was entered as it is now alleged, not as of December 1799, but as of March 1800. It does not appear clearly from a view of the docket, whether the judgment was really entered as of December or March Term, but I will suppose it to be March; still I think the judgment may be supported: nobody was injured by it. To Fitzsimmons, if it made any difference, it was rather an advantage, for he gained something on the score of interest, as upon the entry of judgment on the sci. fa., the interest due on the original judgment would become principal. He never complained, although it was in his power to have had the judgment opened if he considered it as a violation of his agreement. At any rate, it cannot be said that the judgment was void; it was entered by the prothonotary, and never having been reversed, the Court cannot in this collateral way consider it as void.
3d. It has been contended with great earnestness, that the first writ of fi.fa., which was issued within a year after the judgment, not having been returned, the. continuances of the execution could not be kept up by vice comes non misit breve. From the authorities which have been cited, it appears to be the English practice, both in the King’s Bench and Common Pleas, to have the first execution sued out within the year and returned; that being done, you may take out an execution many years after, and support it by filling up the continuances from term to term by vice comes non misit breve. It appears too, that this practice crept upon the English Courts unawares, and upon its being first mentioned to them, they *157 were inclined to disregard it, perceiving that its effect was to render a sci. fa. almost useless. But upon receiving information from their prothonotaries, that the practice was of considerable standing, they thought it best upon the whole to support it. Nothing can show more strongly the regard that every Court pays to its own practice. The question then with us will be, not what is the English practice, but what has been our own. My brother Yeates carries with him the experience of half a .century, in which he has had great opportunity of knowing the practice, not only in this city, but throughout the state. He has no doubt but it has been usual to fill up the continuances by vice comes non misit breve, without having thefrst execution returned, and in his opinion I readily acquiesce, because I can see no substantial advantage given to the defendant by returning the execution. If it could not be issued and returned without being made known to him, it might be said that this .knowledge was of some importance; but we know the fact to be otherwise. The plaintiff may deliver the fi.fa. to the sheriff, and request him to indorse nulla bona upon it, and make return without the defendant’s ever hearing of it. Now, where is the difference to the defendant, between an execution thus returned, and one never put into the sheriff’s hands at all ? I can see none, and therefore I have no hesitation in supporting the plaintiff’s execution.
4th. It is objected that the sheriff did not make a regular levy on the plaintiff’s execution. The return is “levied as “ per inventory, and then forewarned by the marshal not to “ proceed any further in the levy,” Annexed to the retarais an.inventory of part of the furniture of Thomas Fitzsimmons, headed in this manner: “Levied on the following’ “ goods in the name of the whole.” Under the circumstances of the case, all the furniture being in one house, I should consider this as a good levy upon the whole, if there were occasion to enter into that question, but there is not: for assuming at present that the marshal had no right to the goods, (a point to be considered hereafter) they were bound by the plaintiff’s execution from the time it was put into the sheriff’s hands, and this action may be well supported without a levy. The plaintiff has not brought trespass against the marshal; he only demands the money for which the goods were sold. . It was not the business of the sheriff to use force *158 against the marshal; being forbid to proceed, he very prudently desisted, and made return accordingly. But the marshal received full notice of the plaintiff’s claim, both before and after the sale, and particularly just before he paid the money to Mr. Dallas, attorney for Escaraltc. The objection therefore to the formality of the levy is no obstacle to the plaintiff’s recovery in this action.
Having gone through the exceptions to the plaintiff’s proceedings, I will now consider that part of the case which relates to the proceedings in the Circuit Court of the Untied States.
1st. It is said that the case was decided there, and therefore ought not to be tried over again in this Court. But how stands the fact? After the marshal had sold the goods under colour of Escaralte's execution, Mr. Lewis obtained in the Circuit Court a rule on the marshal to bring the money into Court, and being .brought in, he obtained a second rule to show cause why he should not be permitted to take it out of Court. After argument, this last rule was discharged, but expressly without prejudice to Mr. Lewis's resort to the marshal, so that, from the very terms of the decision, it was no bar to this suit. The rule being discharged, the marshal was left at liberty to pay the money as he thought good, and paid it to Mr. Dallas, attorney for Escaralté, after notice from Mr. Lewis not to do so. When a person, not a party to the suit, applies to the Court for leave to take money out, it behoves him to make a very clear case, otherwise the Court will refuse to assist him in a summary way, and leave him to his action. This was precisely the conduct of the Circuit Court. They thought Mr. Lewis's proceedings in this Court irregular, because his first execution was not returned. But knowing that the practice of another Court was a matter in which they might be very liable to mistake, they took the precaution of expressing in their order, that they intended no prejudice to an action to be brought by Mr. Lewis. In any other than a matter of practice, I should have great hesitation in deciding contrary to the Circuit Court. But practice is often arbitrary, and every Court is best acquainted with its own practice.
2d. But the defendant contends that he was authorised to sell Fitzsimmons's goods, by virtue of a fi.fa. from the Circuit Court. This fi.fa. issued to October Term 1803, and *159 the marshal made return in,writing, indorsed on the writ, “ Levied on the real estate of the defendant, which was con- “ demned, as appears by an inquisition annexed.” No mention. was made of a levy on personal estate ; but a venditioni exponas having issued to April Term 1804, it appears by an', entry in the marshal’s docket, that he received the writ on the 28th February 1804, and at ten o’clock in the evening of the same day, he levied on householdfurniture, agreeably to an inventory annexed. A venditioni exponas gives no power to levy; but the defendant contended that the levy was in fact made previous to the return of the fi. fa., and there being some evidence, though in my opinion slight, in support of this assertion, I left it to the jury to decide, whether a levy was made by virtue of the fi.fa., and whether the marshal had made return of such a levy, and at what time, instructing them to find a verdict for the defendant, if they should be of opinion, that there was a levy actually made before the return day of the fi.fa., and a return of such levy before Mr. Lezvis’s execution was put into the hands of the sheriff. This I did, because it had been decided by this Court, that household furniture levied upon by the sheriff, may be left in the hands of. the defendant without being liable to the subsequent execution of a third person. And whatever my own opinion of that decision might be, I did not think myself at liberty to contradict it at Nisi Prius; but I supposed, that considering the great length of time between the alleged levy and the sale, (upwards of eight years) the case could not fall within the decision of this Court, unless the marshal ha'd made return of the levy, so that Mr. Lewis might have notice of it. The jury found for the plaintiff; so, that we must now take for granted, either that the levy was not made on the fi.fa., or that no return was made prior to the time when Mr. Lewis’s execution was put into the hands of the sheriff. In either case, I think it very clear, that the marshal had no authority to sell in 1811, to the prejudice of the plaintiff’s execution. If there was no levy, of course there was no power to sell; and if there was a levy on the furniture, not only not returned, but with an actual return of a levy on real estate, how was it possible that any third person should know any thing of it? and if so, how can it be any other than a fraud in law by permitting Mr. Fitzsimmons to enjoy a false credit during' his whole life, for furniture which did not *160 belong to him ? I say a fraud in law, for I am well satisfied, that no actual fraud was intended. But supposing the defendant’s sale not to be maintainable by virtue of the execution, the defendant’s counsel have very ingeniously brought forward another title, founded on a supposed transfer of the goods from Fitzsimmons to the marshal; and then they say, that although the goods were left for. eight years in possession of Fitzsimmons, and were, liable, while in his possession, to Mr. Lewis's execution, yet the marshal having taken them into his own possession before Mr. Lewis's execution came to the sheriff’s hands, might lawfully hold them against the execution. The facts on which this last claim is' founded must be strictly examined. The defendant gave in evidence a written agreement, without date, (executed no doubt in the year 1804) headed, “ Vend. Exp. Escarammlté v. Fitzsions,” and made by George Clymer and John Craig, friends of Mr. Fitzsimmons, with Alexander J. Dallas, attorney for Escaraltk. In this writing it was first recited, that the marshal had levied on personal property of the defendant (among other things) valued at three thousand dollars, and had advertised the same for sale, and then the subscribers (Clymer and Craig) agreed to guarantee the'said three thousand dollars in the following manner: The property was to remain in the hands of Fitzsimmons, to be delivered on demand to the marshal, to be sold towards satisfying the execution; but if the propertji should be taken ’by any other execution, or not be delivered by Fitzsimmons to the marshal on demand, Clymer- and Craig promised to pay'to Alexander J. Dallas, for the use of the plaintiff, the said sum of three thousand dollars, or in proportion for any part of the goods taken as aforesaid, or not delivered on demand. The goods were suffered to remain in the hands of Fitzsimmons during his life, and very soon after his death (which happened in August 1811) the marshal took them into his possession before Mr. Lewis's execution was delivered to the sheriff. . Now, I ban see nothing in this agreement which looks like an intent to transfer any property to the marshal. On the contrary, it is assumed, that the marshal had that kind of property which was sufficient to make a sale,, and undoubtedly he had, provided he had made a levy before the return day of the fi.fa. It is expressly mentioned, that on demand they were to be delivered to the marshal, to be sold towards satisfying Es- *161 car alte1s execution. Fitzsimmons, the ownér of the goods, was no party to the agreement, which surely he would have been, had a transfer been intended; but the contracting par-r ties are two of his friends, who had no property, and therefore could transfer none. It seems to have been understood by them all, that a subsequent execution of a third person would take the goods, if laid on them while in Fitzsimmons’s possession. In short, the object of the agreement was only to indemnify Escaralté against the risk of leaving the goods in the hands of Fitzsimmons. The defendant’s case then is not helped by this agreement, -so that he must stand on the authority derived from the f.fa. I have said before, that the weight of evidence is in favour of the plaintiff’s assertion, that no levy was made till after the venditioni exponas came to the hands of the defendant; but even if there had, it would surely have been too late to re-seize the goods after the death of Fitzsimmons, and after an interval of eight years from the original seizure. Having considered this case in all its points, my opinion is against a new trial.
Ye ates
J. Eight reasons have been assigned for a new trial in this cause, which I shall consider separately. The last is of a general sweeping nature.
1st. When the Chief Justice charged the jury, that the judgment entered by Benjamin Fuller against Thomas Fitzsimmons was fnal, I understand him to mean that expression as contradistinguishing it from interlocutory, which does not bind lands. He condemned this loose mode of entering judgments, but the practice had become too inveterate to alter it without some rule of Court previously made known. It was not a judgment by default, but by cpnfession: it contained a stay of execution for sixty days, and the subsequent judgment agreed to by Mr. Fitzsimmons, shewed the intention of .-the parties, that they considered it as final. I see nothing incorrect herein.
2d. I am abundantly satisfied, from inspection of the docket and agreement to enter judgment on the scire f acias, that the judgment therein was entered as of December Term 1799. That it was so intended by Mr. Burd, the then prothonotary, can admit of no doubt, from his indorsement on the agreement. It is inserted amongst the suits of December 1799, and it is admitted by the clerk who entered it, that he *162 committed an error in his entry, by inserting 20th March 1800, instead of May 1800, the real time of entry. Should ^ however he mistaken herein, I have nohesitation in saying that this judgment remains in full force until it be reversed. It cannot be annulled collaterally, in another suit between other parties. Mr. Fitzsimmons never complained of it in his life-time; nor can I discover, if such error existed, how it could possibly be injurious to him.»
3d. The counsel on both sides, have shewn much industry in collecting authorities and precedents as .to the mode of entering continuances on afieri facias- of elegit not executed, in England., so as to-sav,e the necessity of taking out a wire facias to'revive the judgment. On the part of the defendant it has been anxiously contended, -that this could be effected there only by the means of the sheriff’s making a return on the first execution.- Rut it is evident that the return of judicial-process, not executed, gives no other information to the defendant than that such process had been sued out; and the same knowledge may be collected from the mere act of taking it out, without such return being made by the sheriff. But admitting the practice in England to be as has been insisted on by the defendant, it can be of no avail in this instance unless it has been adopted amongst us. The practice of Courts of justice forms their law. I do not ground my opinion on this point on the certificate of Mr. Hennesey, although it strengthens my former impressions; it is bottomed on my own experience at the bar for above twenty-five years in the middle counties, and nearly twenty-five years on this bench; and I am well satisfied, that many valuable titles to lands depend on the practice of the plaintiff’s, attorney making return on writs of fieri facias, that vice comes non mi-sit breve, and grounding alias and pluries Ji. fa’s, thereon, after the expiration of the year and day from the judgment. To' this practice I alluded in Young v. Taylor, 2 Binn. 228, when I asserted that the mode of keeping judgments alive by issuing an execution within the year and day, thereby superseding the necessity of issuing a scire facias under the statute of Westminst. 2, was not abolished by the act of 4th April 1793.
4th. I have no doubt that the sheriff’s return to the third plliries Ji. fa. issued on the scire facias, signed by himself and his deputy in these words: « September 12, 1811. Le- *163 •« vied as per inventory, and then forewarned By the marshal « not to proceed any further in the levy,” accompanied with an inventory headed thus: “ Levied on the following, goods « in the name of the whole,” and; specifying sundry articles of furniture, &c.-, was good and sufficiently certain.'
It will be considered hereafter, whether the defendant, as marshal or otherwise, was legally justifiable in retaining the* possession of these goods against the fieri fiadas in the sheriff’s hands. If it shall appear that he was not justifiable herein, and that he has paid over the 'money arising from the sales to one not entitled to receive it, after receiving notice from the party entitled to the proceeds, an action for money had and received will lie against him by such party.
5th. I cannot agree that such proceedings have taken place in the. Circuit Court of the United States, as will bar the plaintiff from recovery in this action.' It is true, the rule to shew cause why Mr. Lezvis should not take the-money out-of Court was discharged, but it was without prejudice to his right to resort to the marshal. It is one thing to deny summary relief to a suitor, under the general powers vested in a tribunal of justice; another thing to declare he has no cause of action where the merits of the whole case have been fully discussed. Where matters of fact are much complicated; where Certain things are asserted on one side to have existed, which have been as- confidently denied on tlxe other side, Courts seldom interpose their extraordinary jurisdiction-,-but leave the party to his remedy in the ordinary..course of justice, Where facts are constitutionally decided by. 'it jury. When the Circuit Court expressly determine that the right of Mr. Lezvis to resort to the marshal should noi be prejudiced by their order, it is perfectly clear that-they could not mean to bar him. The payment of the money to Mr. Dallas for the use of Escaralté, was not decided by the Court, but was made at the risk of the marshal.
6th. Little has been urged in the argument as to the executions issued by ■Verdier, except so far as the papers connect his name with Escaralté* Indeed, Mr. Levy, his attorney* has expressly disavowed any claim to his supposed balance of four hundred dollars, out of the proceeds of sale of. these goods.
As to Escaralté, he obtained judgment against Fitzsitnr mans for $58,64-3 3 cents in the Circuit Court of the United *164 States foffthis district, on the 9th June 1801. Afterwards, on the 7th April, 1803, Mr. Fitzsimmons signed an agreement, that executions might issue in this suit without a scire facias to revive the judgment, notwithstanding the expiration of a year and a day from the time of judgment. In pursuance hereof, on the 17th September, 1803, a. fieri facias, issued re-returnable October Term 1803, upon which a regular return was indorsed, “ Levied on the real estate of the defendant as appears by the inquisition.” The inquisition was annexed to the writ, whereby it appeared that Mr. Fitzsimmons's house and lot in Chesnut street, levied on by the sheriff, had been condemned by the inquest as insufficient to pay the debt and costs within seven years. Judging merely on the face of this return, there cannot be a doubt that the real estate of Fitzsimmons only was levied upon. But if a doubt could have existed in the minds of the most incredulous, it must be removed by the return on the venditioni exponas to April Term 1804. It is thus indorsed:-“ Received, 28th February 1804, at 9 o’clock, P. M. and levied on house- “ hold furniture agreeably to inventory, at 10 o’clock on the “ same day.” It is also observable, that the vend, recites only the levy on the house and lot, without making any mention of the furniture. The return on this vend, and also on Verdier's, states, “ that by virtue of these writs, he had “ taken in execution the goods, &c., contained in the an- “ nexed inventory, and had sold the same for $2,388 85 cts.”, which necessarily could not have been filed in the clerk’s officeiuntil after the sale was rhade in March, 1811. But although on the fieri facias to October 1803, at the suit of Verdier, the house, lot, and furniture, were returned as levied on, without any inventory taken of the furniture, an alias fi-fa. was taken out to October 1804, whereon a levy is returned to have been made on the house and lot in Chesnut street alone. This would seem to be an abandonment of the former levy on the furniture, and no explanation was given of the cause of this new fieri facias and levy. The costs appear to have been afterwards paid. Nothing can be more clear, than that personal property cannot be seized in execution upon a writ of venditioni, or that such property cannot be levied after the day of return of a writ of fieri facias. But it -has.,been said, that it appears by the marshal’s docket, and by, a small paper annexed to the fieri facias, issued in Esca *165 ralte’s suit, (not signed by the defendant,) that the furniture of Fitzsimmons was levied upon on the 17th September 1803'. Suspicious circumstances attended these papers; and it appeared that the entry of the levy on the marshal’s docket in his hand-writing, was not made at the time of the transaction. It also appeared, that the marshal took from the clerk’s office all the executions in Verdier’s and Escaralti’s suits, and whether they had been returned in the same plight in which they were received by him, was highly dubious. The Chief Justice submitted it asa fact to be decided by'the jury, whether the marshal had levied at the suit of Escaralti, on the goods of Fitzsimmons, and made a return thereof before thd day on which the pluriesfi- fa. of Mr. Lewis came to the hands of the sheriff, and if they should be of opinion that the levy and return were so made, he instructed them to find for the defendant; but, if otherwise, for the plaintiff. The verdict of the jury establishes the fact, that the levy was not duly made and returned on the fieri facias of Escaralti; and therefore I feel myself bound to conclude that the defendant, in his political character of marshal, was not justified in taking possession of these goods after the death of Mr. Fitzsimmons,-which happened on the 26th 'August 1811,and in holding and selling them adversely to the execution of Mr. Lewis.
7. But it has been moreover contended, that the agreement made between Messrs. Craig and Clymer and Mr. Dallas operated, under all the circumstances of the case, as a transfer of the furniture to the marshal to secure Escaralté’s debt, and rendered it liable to be sold by him at any subsequent time for that purpose. To this proposition I am compelled to withhold my assent. When the agreement was made we know not. It was drawn up by Mr. Dallas without date. Neither the marshal nor Fitzsimmons were parties thereto. It recites that the marshal had levied on the personal property of Thomas Fitzsimmons, (among other things) valued at three thousand dollars, and had advertised the same for sale, and it was agreed that the property should remain in the hands of Mr. Fitzsimmons, to be delivered on demand to the marshal, to be sold towards satisfying the executions. If the property should be taken by any other executions, or not delivered by Fitzsimmons to the marshal on demand, then Messrs. Craig and Clymer, jointly and severally promised to “ pay to Mr. Dallas, for the use of Escaralti,the above sum *166 of three’thousand dollars, or in proportion for any part taken as aforesaid, or not delivered on demand.” The agreement was manifestly made for the indemnity of the marshal. So far was it from being intended as a transfer of the furniture, on the delivery of the goods to the marshal, it is stipulated that the possession shall continue in Fitzsimmons, and if it shall be taken by subsequent executions, there is a joint and separate engagement to pay the three thousand dollars, or the proportion of any part so taken and not delivered on demand. Here no demand has been shewn to have been made on Fitzsimmons in his life-time, for the goods under the guaranty. If they had really been levied upon on the 17th September 1803, as the marshal’s docket supposes, they had been permitted to remain in the hands of Mr. Fitzsimmons nearly eight years until after his death, thereby giving him a false credit to the world, and the possession not resumed; but if they had been not so levied upon, and Mr. Smith had done what was incumbent on him to do, then the remedy of Es~ car alté would be on the collateral guaranty. On this remedy I give no opinion; but I think the agreement created ns trust in the now .defendant individually, and that it related merely to the marshal in his public character.
Upon the whole matter, therefore, I am of opinion, that the verdict is not against law or evidence, and that the motion for the new trial be denied. .
JBrackenridge J. gave no opinion, having been indisposed and absent during part of the argument.
New trial refused.