# M'Clure *against* Ege.

An execution levied upon personal property and stayed indefinitely by the plaintiff, and suffered thus to remain for about a year and eight months, loses its lien upon the property levied, as to subsequent executions.

APPEAL by the administratrix of David M'Clure, J. D. Cassel and Joseph Crips, for the use of Samuel Irvine, from the decree of the court of common pleas of *Cumberland* County, appropriating the proceeds of the sale of the personal property of Michael P. Ege and Joseph A. Ege.

The opinion of the court contains all the facts of the case, and reviews the authorities cited by the counsel. The cause was argued by

*Devor* and *Alexander*, for the appellants.
*Biddle* and *Watts*, for the appellee.

The opinion of the Court was delivered by

Huston, J.—The facts presented the following case. On the 9th of February 1835, a *fieri facias*, at the suit of D. M'Clure, issued against Peter Ege. Real debt 2466 dollars 29 cents, and costs. And on the 18th and 19th of February, other writs of *fieri facias* ;

[M'Clure v. Ege.]

Crips, for Irvine, and Cassel and the Carlisle Bank, each a *fieri facias,* for sums, amounting, together, to above 3000 dollars.

On the 6th of March 1835, Peter Ege made an assignment of all his personal property at his iron works, and the stock at the works, particularly specified, to his sons, M. P. Ege and J. A. Ege, in consideration of 20,000 dollars, and rented the iron works at 7000 dollars per year. This, it was stated, was done with hopes that the sons, by their exertion, could raise money to extricate their father from his embarrassments. But the sheriff had levied the first, and then the other above specified executions, on this same personal property.

On the 26th of March an agreement was made as follows:

D. M'Clure *v.* Peter Ege; No. 48, of April 1835. Crips for Irvine *v.* The same; No. 69, of same term. J. D. Cassel *v.* The same; No. 70, of same term. Carlisle Bank *v.* The same; No. 71, of same term.

We agree that on the above recited *fieri facias,* now in the hands of the sheriff of Cumberland county, the sheriff shall not proceed to act any further, for the present, but the levies shall remain as they now are, and the writs remain in the sheriff's hands. In case of the appearance of any such danger as would be likely to jeopard the safety of the debt, the sheriff may be directed to proceed. The securities and priority of lien of said executions shall remain as at present. This agreement shall have no effect, unless signed on behalf of all the plaintiffs. M. P. and J. A. Ege covenant that the above executions shall be paid out of the property sold to them by Peter Ege, and which has been levied on by virtue of said writs.

Signed by attorneys of all but the Carlisle Bank, March 16, 1835.

*Test,* Joseph A. Ege.

M. P. Ege.

The deposition of J. A. Ege was taken, who stated that the paper above, contained the whole of the agreement, as he recollected it. That a Mr Weaver was indorser for the debt to the Carlisle Bank; and although he had agreed to the above arrangement, he refused to sign, or let the bank sign; in consequence of which, he, Joseph A. Ege, paid the debt to the bank, and produced the sheriff's receipt. That if the above arrangement had not been made, he and his brother would not have taken the personal property, on the assignment, or taken a lease of the works; and it would have been sold on the executions. That they had also paid a part of the debt to Cassel (above 1100 dollars), and they had paid many other debts of their father.

The depositions of the counsel who signed the agremeent were also taken, not varying the case otherwise than as to their understanding of it. And a notice, dated in August 1836, and served some time in the next autumn, was shown, in which the attorney of David M'Clure requested the sheriff to proceed and sell on his execution. M. P. and J. A. Ege took possession of the property, and carried on the works in their names, immediately after the agreement of 16th

March 1835; and while so carrying on, became indebted, and writs of *fieri facias* issued against them to November term 1836, and to January 1837, and the other terms of that year ; and a *testatum fieri facias*, for 7000 dollars, and another for 3000 dollars, came from York county.   At length the sheriff sold, and to M'Clure's execution returned (for the *fieri facias* had never been returned, until after the sale in 1838), " Levied on the personal property of P. Ege, as per schedule (which specified almost every thing), and execution stayed by agreement signed by the plaintiff's attorney, a copy of which is hereto attached ; after which a portion of said property was consumed, and disposed of by the defendant, the same being in use by the defendant, at his furnace called Pine Grove, and the residue was transferred by the defendant to M. P. and J. A. Ege, against whom writs of *fieri facias* were issued, and the property, embracing part of that I had so levied on, was sold for 12,889 dollars 79 cents, on said *fieri facias*, on which I have returned money made, as before the said sale. Mr Alexander, the attorney of the plaintiff, M'Clure, gave me notice to proceed on this writ.   The money is in my hands for distribution, and I will pay the same according to the decree of the court."

The amount due on the several executions against M. P. and J. A. Ege, exceeds the sum in court.

Peter Ege had assigned the lease from his sons for 7000 dollars per year, to a Mr Lewis, for the first year, and also for the year ending in 1837 ; and the lease for the year ending in March 1838, to a Mr Gardner.   There was no allegation that these were not *bona fide*, and to pay moneys advanced by those gentlemen.   There was due of rent of last year, after allowing all credits, 5542 dollars 46 cents. This was claimed for the landlord, under an act securing rent not exceeding one year.

J. A. Ege proved, that of the property sold, about 5000 dollars worth was the same which they got from their father.

It may not be amiss to take a short review of the practice and decisions relating to the subjects in contest here.   In Leidy *v.* Wallace, 4 *Dall.* 163, we find it said : " the law in this country is not the same as in England.   This departure from the English practice arose from sentiments of humanity, and the peculiar situation of the country. In the interior, goods were never removed, after the levy.   If, however, the intention of leaving them with the defendant was fraudulent, a subsequent execution would be preferred in Pennsylvania, as well as in England."   The levies, in that case, were on horses and cattle and farming utensils, and the money was awarded to an execution levied two years before, in preference to a later one.   A few pages after, in the same book, will be found Chancellor *v.* Philips, in which a distinction is taken between household goods and a store, or any articles expressly kept for sale.

I do not cite these cases as evidence of what the law now is, but as showing what it was once considered to be.

In Smith *v.* Lewis, 2 *Serg. & Rawle* 159, the position is distinctly

[M'Clure v. Ege.]

admitted, that leaving property levied on in the hands of the defendant, does not make it subject to be taken by a subsequent execution; yet, it is said, leaving it a great length of time may make a difference, especially if the levy is not returned, and the defendant thereby gained a false credit.

In Eberle *v.* Myers, 1 *Rawle* 366, we find a case of a stay ordered by the plaintiff, and the property used and offered for sale by the defendant; and other circumstances, which showed an intention to protect the defendant in possession of the goods; and a second execution took the proceeds.

In Howell *v.* Atkin, 2 *Rawle* 281, the plaintiff told the sheriff he need not remove the goods; in less than a month there came a second execution; but as there had been no orders to stay by the plaintiff, the first execution took the proceeds. The superiority of the English practice, and the necessity by it of removing the goods, or leaving an officer in the house, had been very warmly urged, and part of the opinion was in vindication of our practice: the conclusion is, however; "I give no opinion as to what length of time may elapse after a levy. I know of no fixed rule. If from the declarations of the plaintiff it is apparent the levy is made, not to collect the money, but to protect the goods of the defendant from other creditors, it is, as to those others, fraudulent. This may be inferred from circumstances; and, in some cases, from great length of time; and when fraud is found, the levy loses its preference."

In 4 *Rawle* 380, whether the first execution shall lose its preference, is put on the point whether the plaintiff ordered a stay of proceedings.

And in 5 *Watts* 302, it is said, the procrastination of the sheriff, even by the sufferance of the execution creditor, is not fraudulent *per se,* and the creditor is to be postponed only where he has directed the sheriff not to proceed.

I go back to The Commonwealth *v.* Strembeck, 3 *Rawle* 343, as being, in some particulars, more like the one before us. It is there suggested, that delay so great as in the first cases in *Dallas,* would not be safe now. That although no fraud was intended, there might be what would be considered a fraud in law; as in the case of a sale or mortgage of personal property, and the former owner still retaining possession. And a sale to a *bona fide* purchaser, or an assignment to trustees for all creditors, and deed recorded, and bond given, and possession taken, is put on the same footing with a subsequent execution; and the title of such assignees held good after a stay of execution by the first creditor of fourteen months.

We come now to the present case. I shall premise that there seems to be nothing in the objection that the Carlisle Bank did not sign the agreement. The object of that was, that no one of the four execution creditors, by withholding his signature, should sell the goods levied on, so as to gain a preference over the others. This debt was paid by the purchaser of the goods, and left the levies of

[M'Clure v. Ege.]

the other three as they stood ; better than before, instead of worse. The object of these creditors, I may assume, was not to defraud any person, but intended as an act of kindness to Mr Ege and his family; at the same time intending to keep themselves safe : but it was an indefinite stay of the executions; it was more, it was expressly part of the agreement, that the defendant, Peter Ege, should sell the property levied; or, more properly, to enable him to comply with a sale already made. It induced the sons to take the property, and in consideration of it, to assume the debts to these three plaintiffs, and to others. It induced these young men to engage in the management of the works; and the possession of this personal property conduced to give them credit; and, we may presume, gained them credit. The agreement was, that the goods should be subject to these levies ; and even the fact that such levies had been made, was not known, except to the parties and the sheriff; the writs and levies were not returned. In the mean time, some of the debts of the father were paid off; but heavy debts were contracted by the sons. After some judgments had been obtained against the sons, and many suits were instituted, the plaintiffs in the first executions, or some of them, requested the sheriff to sell on their executions. He did not; but sold and returned the fact, and the court distributed the money ; and we see no error in the decree.

It has been argued that we ought to decide the cause as if the sheriff had sold in November 1836. We do not think so ; we must decide on the facts as they occurred; not on them as one party wished them to occur. And we are not called on to decide whether, after the agreement in this case, the young men assuming responsibilities, and others giving them credit on the ground of the first creditors agreeing that the property of the father, already levied on, should be sold to them and put into their possession, the first creditors had or had not lost all lien on the personal property, as against those who trusted the sons. But we affirm the decree because of this indefinite stay and the length of time which elapsed, and the other circumstances. The right of M'Clure and others, as against the creditors of the sons, was gone.

Decree affirmed.